# United States Court of Appeals

## For the Seventh Circuit

### Chicago, Illinois 60604

**NOTICE OF ISSUANCE OF MANDATE**

DATE:    October 16, 2006

TO:      John M. Waters
         United States District Court
         Central District of Illinois
         Suite 218
         201 S. Vine Street
         U.S. Courthouse
         Urbana, IL  61802-3369

**FILED**

**OCT 1 8 2006**

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

FROM:    Clerk of the Court

RE:      05-1411
         USA v. James, Louis
         04 CR 20025, Michael P. McCuskey, Chief Judge

Herewith is the mandate of this court in this appeal, along
with the Bill of Costs, if any.  A certified copy of the
opinion/order of the court and judgment, if any, and any
direction as to costs shall constitute the mandate.

[ ] No record filed
[X] Original record on appeal consisting of:

**ENCLOSED:**                    **TO BE RETURNED AT LATER DATE:**

| | | |
|---|---|---|
| [ ] | Volumes of pleadings | [1] |
| [ ] | Volumes of loose pleadings | [ ] |
| [ ] | Volumes of transcripts | [3] |
| [ ] | Volumes of exhibits | [2] |
| [ ] | Volumes of depositions | [ ] |
| [ ] | In Camera material | [1] |
| [ ] | Other_____ | [ ] |

Record being retained for use          [ ]
in Appeal No. _____

Copies of this notice sent to:          Counsel of record
[X]      United States Marshal
[X]      United States Probation Office

**NOTE TO COUNSEL:**
If any physical and large documentary exhibits have been filed in
the above-entitled cause, they are to be withdrawn ten days from the
date of this notice.  Exhibits not withdrawn during this period will
be disposed of.

Please acknowledge receipt of these documents on the enclosed copy
of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S.
Court of Appeals for the Seventh Circuit.

Date:  **10-18-06**_____          **s/S. Doan**_____
(1071-120397)                               Deputy Clerk, U.S. District Court

CERTIFIED COPY

## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1411

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

LOUIS JAMES,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 20025—Michael P. McCuskey, *Chief Judge.*

ARGUED NOVEMBER 9, 2005—DECIDED SEPTEMBER 22, 2006

Before POSNER, ROVNER and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Following a jury trial, Louis James was convicted of possession of more than fifty grams of crack cocaine (Count I), possession of and carrying a firearm in furtherance of a drug trafficking crime (Count II), and possession of a firearm by a felon (Count III). He was sentenced to 360 months' imprisonment. He challenges the sufficiency of the evidence on the carrying prong of Count II, complains of a number of errors in the jury instructions, and charges that the admission of certain "other bad acts" evidence unfairly prejudiced him. We affirm.

## I.

In the fall of 2002, Louis James met Bradley Collier, a Decatur-area drug dealer, when both were living at a local motel. Collier learned from others at the motel that James was selling cocaine. Collier began to buy crack cocaine from James, at first in small quantities but later in larger quantities. At times, Collier paid cash for the drugs, and at other times, James fronted the cocaine to him. Collier typically resold the drugs at a profit, earning several hundred dollars per day at this trade. This arrangement continued until January 2004, when Collier moved into James' home at 1061 East William Street in Decatur (hereafter the "William Street house"). James lived there with his girlfriend, Tiara Woods. During Collier's two- to three-week stay at the William Street house, Collier and James sold marijuana and manufactured and sold crack cocaine. After Collier moved out, he continued to obtain cocaine from James.

In early February 2004, Decatur police officers began surveilling Collier after receiving a tip. On February 2nd, they observed him visit James' home where, they later learned, he purchased an ounce of cocaine. Collier then sold that ounce and returned to James' home to purchase two additional ounces of cocaine. After that second purchase, Collier proceeded to the Decatur Best Western motel where the officers then arrested him. The officers searched Collier's person, car, and motel room and recovered approximately seventy-four grams of cocaine, plastic baggies and a digital scale. After the arrest, the officers returned to the William Street house to conduct further surveillance. They saw James exit the house with two duffel bags and three dogs, all of which he loaded into his car. The officers followed James as he drove in an evasive manner to a house at 456 East Johnson Street (hereafter the "Johnson Street house"). James stayed at the Johnson Street house for approximately thirty minutes, and then

drove to two separate residences, staying at each for less than half an hour. James returned to the Johnson Street house for a few minutes and then proceeded to an alley. In the alley, a man entered James' car and exited again a minute later. After the man drove away, the officers stopped him and recovered a small amount of cocaine and a cell phone that had been used to call James shortly before the rendezvous in the alley.

The officers conducted a traffic stop of James and recovered $100 in cash, two cell phones and a key to the William Street house. Based on the arrest of Collier, the officers obtained a search warrant for the William Street house, where they discovered many items related to drug trafficking. They seized a rock of crack cocaine, marijuana, plastic baggies, two digital scales, baking soda, two cell phones and a stun gun. They also recovered two loaded shotguns and one loaded .25 caliber pistol.

At roughly the same time, two Decatur police officers approached the Johnson Street house and attempted to obtain consent to search the house. Tiara Woods was in the house with her aunt, Evita Boey, who resided at the house. When the officers knocked on the door, Woods asked who was knocking but did not open the door. One of the officers could see into the house and he saw Woods pick up a shoebox and carry it to the back of the house. After several more minutes of knocking, Boey opened the door and consented to a search of the house. During the search, the officers found the shoebox in a bedroom at the back of the house. Inside the shoebox was a pair of size 10 sneakers. On top of the sneakers were a small scale, a Crown Royal bag and a glove. Inside the glove was a loaded .25 caliber handgun. Collier, the main witness against James at trial, testified that James owned four firearms, including two rifles and two .25 caliber handguns. Inside the Crown Royal bag and inside one of the shoes, the officers found a Newport cigarette wrapper,

several plastic baggies containing more than eighty grams of crack and fifty grams of powder cocaine. James' fingerprint was discovered on one of the baggies of cocaine found inside the shoe. In addition to the contents of the shoebox, the officers seized six ounces of marijuana from a black bag in the living room and $2,375 in cash found in the pocket of a coat. In another pocket of the same coat, the officers found an identification card for Woods listing the William Street house as her address.

Following the searches, James and Woods moved to 1152 West Ash Street (hereafter the "Ash Street house") in Decatur. Throughout February and extending into early March 2004, Collier continued to obtain crack cocaine from James, who was manufacturing and distributing crack from the Ash Street house. The Decatur police surveilled the Ash Street house and on March 5, 2004, saw several people leave the house in a gray car. The officers stopped the car, in which James and Woods were passengers. The officers searched the car and seized $345 in cash and a small amount of marijuana from the floorboard under James' seat. They then searched the Ash Street house, recovering a glass dish with white residue, plastic baggies, baking soda, a Newport cigarette box containing marijuana and a digital scale. From a dryer vent on the outside of the house, the officers recovered seven grams of crack and twenty-seven grams of powder cocaine.

Prior to the start of trial, defense counsel requested that the government disclose any evidence it intended to present under Federal Rule of Evidence 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

> edge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). The government then notified the defense that it intended to introduce, among other things, evidence from the search of the Ash Street house and evidence seized during the traffic stop of James that same day. Unfortunately, the government informed the court that this evidence was seized on February 10, 2004, only a week after the crimes that were charged in the indictment, and the government portrayed this evidence as intricately related to the crime charged. In fact, the traffic stop and search had taken place on March 4, 2004, more than a month after the offense charged in the indictment. Without knowing about the error in the date, the court ruled that the drugs, drug paraphernalia and cash seized from Ash Street and from the contemporaneous traffic stop were admissible as evidence intricately related to the crime charged. No one noticed the error in the date until shortly before the trial commenced. On the morning the trial began, defense counsel filed a motion to exclude the evidence seized on March 4th on the ground that there was insufficient foundation for its admission. The government informed the court that it had mistakenly represented in its previous filing that the evidence was seized on February 10th but maintained that the court should still find that the evidence was intricately related to the charged conduct. The court denied the defense motion to exclude the March 4th evidence because the motion was untimely, not the result of surprise, and not supported by either fact or law. As we noted earlier, the jury returned a guilty verdict on all three counts. James appeals.

2:04-cr-20025-MPM-DGB    # 69    Page 7 of 21

## II.

On appeal, James contends that the district court should have ordered a judgment of acquittal on the "carrying" part of Count II because there was no evidence that he transported firearms at any time. He takes issue with the district court's wording of the "no adverse inference" jury instruction. He also maintains that the court erred by denying him jury instructions related to "mere presence" and "mere association." Finally, he charges that the evidence seized on March 4th should not have been admitted because it was not intricately related to the charged conduct.

### A.

We begin with James' claim that the district court should have granted his motion for a judgment of acquittal on the charge of carrying a firearm in relation to a drug trafficking crime. We review the district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Jones*, 371 F.3d 363, 365 (7th Cir. 2004); *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). Such a motion should be granted only when the evidence is insufficient to sustain the conviction. *O'Hara*, 301 F.3d at 569. In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and overturn a conviction only if the record contains no evidence from which a rational jury could have returned a verdict of guilty. *O'Hara*, 301 F.3d at 569-70.

The indictment charged that James knowingly carried and possessed a firearm in furtherance of a drug trafficking crime. James does not dispute that the evidence is sufficient to prove he possessed a firearm in relation to a drug trafficking crime, but argues that there is nothing more than speculation in the record to support a charge

of carrying. In defining the term "carry," we have turned to the ordinary, dictionary definition of the word and took "carry" to mean "to move while supporting: TRANSPORT." *United States v. Molina*, 102 F.3d 928, 930 (7th Cir. 1996) (*citing United States v. Baker*, 78 F.3d 1241, 1247 (7th Cir. 1996)). We emphasized that something more than possession of the firearm in relation to the drug trafficking crime was required to demonstrate carrying. *Baker*, 78 F.3d at 1247. For example, a defendant who transports a gun on his person or within his reach, available for immediate use, during and in relation to a drug-trafficking crime meets the definition. *Baker*, 78 F.3d at 1241. Circumstantial evidence could suffice to support the charge, and the government argues here that the circumstantial evidence was compelling, relying on *Young v. United States*, 124 F.3d 794 (7th Cir. 1997).

The evidence regarding the guns was thin. Collier testified that James owned four firearms, two .25 caliber pistols and two twelve gauge shotguns. Two shotguns and a pistol were found at the William Street house where Collier briefly resided with James. A second pistol was recovered from the Johnson Street house, the home of Evita Boey. Boey was the aunt of James' girlfriend, Tiara Woods. That gun was found in a shoebox along with a bag of cocaine that was marked with James' fingerprint. This was clearly enough evidence to demonstrate that James *possessed* a firearm in furtherance of a drug trafficking crime but we doubt it was enough to demonstrate carrying or transportation of the gun in relation to a crime of drug trafficking. Collier never testified where or when he saw the guns that James owned. Collier had been to Boey's Johnson Street house as well as the William Street house and thus could have seen James with the firearms in either location. There was no evidence that the firearm had been in one place and then was found somewhere else. When James objected at trial to a jury instruction on

carrying, the government represented that there was direct testimony that James possessed the firearm found at the Johnson Street house at his William Street residence. With that understanding, the court allowed the instruction on carrying to be given because the court believed there was testimony that the gun had been in one place and then was found in another place. But the prosecutor was mistaken and inadvertently misled the court. In fact, Collier had never testified where he saw the guns that James possessed. There was no direct testimony that James possessed all of the guns at the William Street house. There was literally no evidence that any of the guns had ever been moved or had ever changed location. There was no evidence that James ever carried the gun on his person or in his car while engaged in drug trafficking. The evidence showed only that he stored the guns near drugs.

The government makes much of the fact that the gun was found in a shoebox with drugs and that it did not appear at the Johnson Street house by magic. The same is surely true of the guns found at William Street; they too did not appear there by magic. Yet the government makes no argument about those guns being carried, perhaps acknowledging that possession is not the same as carrying. To prove the charge of carrying, the gun must be transported in connection with a drug trafficking crime. Nothing in this record points to anything more than possession in connection with a drug trafficking crime. In *Young* and in the other carrying cases, there was evidence that the defendant either carried the gun on his person or close at hand in his car or moved the gun from one place to another, while engaged in a drug trafficking crime. *See Young*, 124 F.3d at 801 (carrying requirement met where Young moved the gun from his apartment to his car and then transported the gun and drugs in the car to the delivery location); *Molina*, 102 F.3d at 932 (carrying

requirement met where the defendant was transporting drugs and a gun in a secret compartment hidden in his car); *Baker*, 78 F.3d at 1247-48 (carrying requirement met where gun and crack cocaine were found under driver's seat of a car being driven by the defendant). The district court's initial instinct that there was no evidence of carrying was correct. The instruction should not have been given.

That said, the error was harmless. As we noted earlier, James does not contest the sufficiency of the evidence that he possessed a firearm in furtherance of a drug trafficking crime. "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as [the defendant's] indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States*, 396 U.S. 398, 420 (1970). We have applied this rule to multiple acts charged under section 924(c). *See United States v. Jones*, 418 F.3d 726, 730 (7th Cir.), *cert. denied*, 126 S. Ct. 817 (2005). The evidence was sufficient as to the possession prong of section 924(c) and thus the conviction will stand.

## B.

James next argues that the district court erred when it refused to instruct the jury that it could not find him guilty if he was merely present at a crime scene or if he was merely associated with a person who committed a crime. These are referred to respectively as "mere presence" and "mere association" instructions. According to James, his main theory of defense was that, although he lived with and associated with Collier, a cocaine dealer, James himself sold only marijuana. He also relies on his association with Tiara Woods, who he contends possessed the shoebox containing cocaine at her aunt's house, as an

No. 05-1411

example of his mere association with wrong-doers. The
district court declined to give these instructions because,
having heard the evidence and defense counsel's opening
statement, the court was convinced that the instructions
would be confusing and unsupported by the evidence. The
court also found that these theories of defense were not
presented at the outset of the case and would not be
justified based on the evidence or any defense theory that
had been presented up to that time. The court made this
ruling at the close of evidence and shortly before clos-
ing arguments.

We review a district court's refusal to give a tendered
jury instruction *de novo.*[1] *United States v. Fiedeke*, 384

---

[1] The government argues that James forfeited this argument
by failing to properly preserve it in the district court and
suggests that we should review this argument for plain error
only. Our review of the record, however, indicates that defense
counsel argued in a timely and specific fashion in favor of the
instructions, citing both the law and the facts in support of the
instruction. Indeed, the government agreed during the exten-
sive argument that some form of the mere presence instruction
would be appropriate, preferring to err on the side of caution
because this was a theory of defense instruction. After vigorous
and complete argument, the court ruled definitively that it
would give neither a mere presence nor a mere association
instruction. Federal Rule of Criminal Procedure 30(d) requires
only that a party who objects to a failure to give a requested
instruction must inform the court of the specific objection and
the grounds for the objection before the jury retires to delib-
erate. It is enough that defense counsel alerted the court and the
opposing party to the specific grounds for the objection in a
timely fashion. *United States v. Linwood*, 142 F.3d 418, 422 (7th
Cir. 1998). Defense counsel did so at length. There is no utility in
requiring defense counsel to object again after the court has
made its final ruling. *Cf. Wilson v. Williams*, 182 F.3d 562, 566-
(continued...)

F.3d 407, 410 (7th Cir. 2004), *cert. denied,* 543 U.S. 1079
(2005). A defendant is entitled to have the jury consider
any theory of defense that is supported by law and fact.
*Fiedeke,* 384 F.3d at 410. That does not mean a defendant
is entitled to a particular jury instruction, however.

> To be entitled to a particular theory of defense instruc-
> tion, the defendant must show the following: 1) the
> instruction is a correct statement of the law, 2) the
> evidence in the case supports the theory of defense,
> 3) that theory is not already part of the charge, and
> 4) a failure to provide the instruction would deny a fair
> trial.

*Fiedeke,* 384 F.3d at 410. James' proposed instructions
were correct statements of the law and, arguably, there
was some evidence that James was merely present or
merely associated with other persons who were engaged
in criminal activity, namely Collier and Woods. However,
this theory of defense was intrinsically part of the charge
and the failure to provide these instructions did not
deny James a fair trial. The court instructed the mem-
bers of the jury that in order to find James guilty of any of
the three counts, they must find that he acted knowingly.
The court explained that a defendant acts knowingly when
he "realized what he was doing and was aware of the
nature of his conduct and did not act through ignorance,
mistake, or accident." Tr. at 591. For the possession with
intent to distribute charge, the court explained that
"[p]ossession of an object is the ability to control it. Pos-
session may exist even when a person is not in physical
contact with the object but knowingly has the power and

---

[1] (...continued)
67 (7th Cir. 1999) (*en banc*) (once a court has ruled definitively
in pretrial proceedings, there is no utility in requiring another
objection during trial). The issue was properly preserved.

intention to exercise direction and control over it, either directly or through others." Tr. at 592. The instruction on the other counts also required a finding of knowledge on James' part. Thus, the jury could not have found James guilty if it believed that he was merely present or merely associated with persons committing these crimes. The "mere association" and "mere presence" instructions are designed to inform the jury that guilt should not follow from association with those who commit crimes or from presence at the scene of a crime. *United States v. Scott*, 267 F.3d 729, 738 (7th Cir. 2001). Rather, guilt may be found only when the defendant knowingly participated in the criminal activity. *Scott*, 267 F.3d at 738. The instructions here adequately apprised the jury of this principle and therefore it was not error to refuse to give the "mere presence" and "mere association" instructions.

## C.

The court instructed the jury, "The defendant has an absolute right not to testify. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." Tr. at 590. At the jury instruction conference, defense counsel informed the court that she would prefer that the instruction refer to "a defendant" rather than "the defendant" because the latter called attention specifically to James. The government agreed to defense counsel's wording but the court declined to use it, noting that "a defendant" was a phrase used only when there were multiple defendants. On appeal, James argues that the district court violated James' right to a complete Fifth Amendment instruction when it denied the request that the jury be informed that the Fifth Amendment privilege applies to all defendants rather than to James in particular. The precise wording of jury instructions is a matter left to the discre-

tion of the district court. *Scott*, 267 F.3d at 738. The notion that the jury somehow concluded from the court's use of the phrase "the defendant" that James was being singled out for the right not to testify is a frivolous contention. We can think of no reason why the court would be required to instruct the jury more generally about the rights of other persons not on trial. Nothing in the wording drew unusual attention to James. The instruction was a correct statement of the law and the wording was certainly not an abuse of the district court's discretion. *See Carter v. Kentucky*, 450 U.S. 288, 300 (1981) (the Fifth Amendment requires that a criminal trial judge must give a "no-adverse-inference" jury instruction when requested by a defendant to do so).

## D.

Finally, James argues that the district court should not have admitted the evidence that was collected more than a month after the offense for which he was indicted, maintaining that this evidence was not intricately related to the conduct charged and was not admissible under Federal Rule of Evidence 404(b). James is referring, of course, to the evidence seized from his person, his car, and the Ash Street house on March 4, 2004. This evidence consisted of cash, marijuana, a glass cup with white residue, baking soda, digital scales and approximately thirty-seven grams of cocaine. The indictment specified that all of the charged conduct occurred "on or about February 2, 2004." As we noted earlier, prior to trial, defense counsel requested notice of any Rule 404(b) evidence the government intended to introduce at trial. The government responded that it intended to introduce evidence seized from the Ash Street residence and the traffic stop, but mistakenly told the court that these searches were conducted on February 10th, approximately

one week after the events charged in the indictment. In fact, this evidence was seized on March 4th, more than a month after the February 2nd events. The government contended that this evidence was intricately related to the charged conduct. The court, unaware of the date error, "agree[d] that evidence obtained by law enforcement officers between February 2 and 10, 2004, is either direct evidence of the crime charged or evidence intricately related to those offenses." R. 29, at 3-4. The court therefore found the evidence admissible. Defense counsel later sought to exclude this evidence on the ground that there was insufficient foundation for its admission. After learning that the evidence was seized more than a month after the events charged in the indictment, the court nonetheless rejected the motion because it was untimely, not the result of surprise, and not supported by either fact or law.

The government is correct that James did not object to the admission of this evidence on Rule 404(b) grounds until this appeal, and James has therefore forfeited this argument; our review is thus limited to the correction of plain error. *United States v. Pree*, 408 F.3d 855, 868 (7th Cir. 2005). Before we may correct an error not raised at trial, we must find (1) that there is error, (2) that it is plain, and (3) that it affects substantial rights. *Pree*, 408 F.3d at 868-69. Once these three conditions have been met, we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Pree*, 408 F.3d at 869. The defendant bears the burden of establishing that the error affected substantial rights, by establishing that the outcome probably would have been different without the error. *Id.*

Generally, evidence of other bad acts is not admissible to show a defendant's propensity to commit a crime, nor to show that he or she acted in conformity with that

No. 05-1411                                    15

propensity on the occasion in question. *United States v. Jones*, 389 F.3d 753, 757 (7th Cir. 2004), *vacated,* 125 S. Ct. 2948, *reinstated in part,* 2005 WL 2456605 (7th Cir. Oct. 6, 2005) (reaffirming the decision that rejected challenges to conviction but vacating and remanding the sentence for resentencing in conformity with *Booker*); Fed. R. Evid. 404(b). This evidence may, however, be admitted under Rule 404(b) to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Jones,* 389 F.3d at 756; Fed. R. Evid. 404(b). If the evidence of other crimes or bad acts provides direct or inextricably intertwined evidence (often referred to as intricately related evidence) of the acts charged, it is not subject to the constraints of Rule 404(b). *United States v. Lane,* 323 F.3d 568, 579 (7th Cir. 2003). Although intricately related evidence need not satisfy the constraints of Rule 404(b), it must satisfy the balancing test of Rule 403. *Lane,* 323 F.3d at 580. The government maintains that the evidence collected on March 4th was intricately related to the charged conduct and that it corroborated the testimony of a government witness. Under the "intricately related evidence" doctrine, the admissibility of uncharged conduct turns on whether the evidence is properly admitted to provide the jury with a complete story of the crime on trial, whether its absence would create a chronological or conceptual void in the story of the crime, or whether it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of the charged crime. *Lane,* 323 F.3d at 580; *United States v. Harris,* 271 F.3d 690, 705 (7th Cir. 2001); *United States v. Ryan,* 213 F.3d 347, 350 (7th Cir. 2000); *United States v. Gibson,* 170 F.3d 673, 681 (7th Cir. 1999); *United States v. Akinrinade,* 61 F.3d 1279, 1285-86 (7th Cir. 1995); *United States v. Spaeni,* 60 F.3d 313, 316 (7th Cir. 1995); *United States v. Ramirez,* 45 F.3d 1096, 1102 (7th Cir.

No. 05-1411

1995); *United States v. Hargrove*, 929 F.3d 316, 320 (7th
Cir. 1991).

According to the government, the evidence seized on
March 4, 2004, provided the jury with a complete story of
the charged offenses and a chronological unfolding of the
events that led to the indictment. This argument is
puzzling at best. James was charged with possession with
intent to deliver crack cocaine, possession of a firearm in
furtherance of the crack cocaine offense, and possession
of a firearm by a felon. All of these offenses were complete
as of February 2, 2004, the date charged in the indictment.
There were no chronological gaps to explain, no conceptual
voids in the story that needed to be filled. The story
was complete on February 2, 2004; the March 4th evidence
did nothing to explain the circumstances of the charged
offenses nor did it tend to prove any element of the
charged conduct. The events of March 4, 2004, were not
blended with or connected to the crimes charged; instead,
the March 4th evidence could have formed the basis of a
separate count against James that the government appar-
ently chose not to pursue. The only link between the
March 4th evidence and the charged offenses was propen-
sity. In other words, the evidence seized on March 4th was
relevant to the charged conduct only if the jury was
inclined to believe that a person possessing cocaine in
March was likely to have possessed it in February as well,
that a person who broke the law in March was likely to
have broken the same law in February. This is pure
propensity evidence. Moreover, the March 4th evidence
does not fall within one of the exceptions to the 404(b)
exclusion.

The cases on which the government relies are inapposite.
In *Lane*, we affirmed the admission of evidence related
to a number of debts the defendant held in order to ex-
plain his financial situation in a case where the defen-
dant was charged with defrauding banks by obtaining

loans without revealing his true financial situation. 323 F.3d at 580-81. In *Ryan*, the defendant was charged with bank fraud, a specific intent crime, and we therefore upheld the admission of evidence that the defendant failed to report kickbacks he received fraudulently on his tax returns because this failure demonstrated that the defendant was aware his conduct was wrongful. 213 F.3d at 350. In *Harris*, we affirmed the admission of evidence of prior drug transactions between the defendant and his buyer because they explained the defendant's *modus operandi*, including his use of code language that would have been confusing to the jury without the context of these prior transactions. 271 F.3d at 705. *Akinrinade* was a drug conspiracy case where the other bad acts evidence consisted of acts committed during the early days of the conspiracy, which fell outside the period specified in the indictment. This evidence was admitted to show the relationships between the conspirators and their methods of operating. 61 F.3d at 1286. In *Ramirez*, we agreed that the admission of marijuana seized from the defendant in a cocaine conspiracy case was relevant to rebut his defense that he was an innocent bystander rather than a member of the conspiracy. 45 F.3d at 1102-03. And in *Hargrove*, we affirmed the admission of testimony that, at the time of the defendant's arrest, which occurred ten months after the charged drug conspiracy, the arresting officers found a large amount of cash and pagers in the defendant's truck, and that a drug-sniffing dog had alerted to two areas of the truck although no drugs were found. In each case, the interrelated nature of the evidence admitted to the conduct charged is self-evident. There is no such connection here.

The government's final argument in support of the admission of this evidence is that it corroborated Collier's testimony that James lived at and sold cocaine from the Ash Street house. As such, the evidence was relevant to

Collier's veracity. This argument begs the question, however, because Collier's testimony that James was selling drugs out of the Ash Street house a month after the charged offense suffers the same infirmities as the physical evidence collected from the Ash Street house on March 4th. It was, in short, error to admit evidence of a separate, similar crime that served no purpose other than to show that James had a propensity to engage in drug trafficking crimes. But we are reviewing for plain error only and James cannot meet his burden of establishing that the error affected substantial rights. To meet that burden he must demonstrate that the outcome probably would have been different without the error. *Pree*, 408 F.3d at 869. We cannot say that the jury would have reached a different conclusion if it had not been exposed to the March 4th evidence. Unlike the gun evidence, the evidence against James on the drug trafficking charge was quite strong. The jury almost surely would have reached the same conclusion given the fingerprint on the bag of cocaine found at Boey's house after James visited there, Collier's detailed testimony about his drug trafficking activities with James, and the evidence that police seized cocaine from a person who met with James for one minute in an alleyway. Moreover, the court instructed the jury on the limited use of evidence of other acts not charged in the indictment. The court informed the jury that it could consider these other acts "only on the question of the defendant's knowledge, intent, and absence of mistake," and that it could not consider the acts for any other purpose. The court continued, "Acts other than those charged in the indictment . . . [are] not evidence of the defendant's guilt of any crime for which the defendant is now charged." Tr. at 590. We assume the jury followed these instructions, *United States v. Della Rose*, 403 F.3d 891, 905 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 2044 (2006), thus lessening the impact of the erroneously ad-

No. 05-1411                                                    19

mitted evidence. Because James failed to establish that the admission of the March 4th evidence affected substantial rights, *Pree*, 408 F.3d at 868-69, we affirm.

## III.

For all of the reasons stated above, the judgment of the district court is

AFFIRMED.

A true Copy:

Teste:

_____
Clerk of the United States Court of
Appeals for the Seventh Circuit

USCA-02-C-0072—9-22-06

# United States Court of Appeals

## For the Seventh Circuit

## Chicago, Illinois 60604

### JUDGMENT - WITH ORAL ARGUMENT



**Date: September 22, 2006**

**BEFORE:**    Honorable RICHARD A. POSNER, Circuit Judge

Honorable ILANA DIAMOND ROVER, Circuit Judge

Honorable DIANE P. WOOD, Circuit Judge

No. 05-1411

UNITED STATES OF AMERICA,
                    Plaintiff - Appellee

    v.

LOUIS JAMES,
            Defendant - Appellant

Appeal from the United States District Court for the
Central District of Illinois
No. 04 CR 20025, Michael P. McCuskey, Chief Judge

        The judgment of the District Court is AFFIRMED,
in accordance with the decision of this court entered on this date.

(1061-110393)

CERTIFIED COPY
A True Copy:
    Teste:

Clerk of the United States
Court of Appeals for the
Seventh Circuit.